## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| EGAN-JONES RATING COMPANY<br>61 Station Road<br>Haverford, PA 19041 | :<br>:<br>:    Civil Action No. _____ |
| | : |
| SEAN EGAN<br>61 Station Road<br>Haverford, PA 19041 | :<br>:    **COMPLAINT**<br>:<br>:    **JURY TRIAL DEMANDED** |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549 | :<br>:<br>:<br>: |
| Defendant. | : |

For their Complaint against the United States Securities and Exchange Commission (the "SEC" or the "Commission"), Plaintiffs Egan-Jones Rating Company ("Egan-Jones" or "EJR") and Sean Egan upon knowledge as to their own actions and dealings, and upon information and belief as to the Defendant and its actions, allege as follows:

## I.     INTRODUCTION

1.     On April 19, 2012, during a non-public closed meeting of the SEC, details of which the SEC leaked to the press in advance, the SEC authorized the institution of a public administrative proceeding against Egan-Jones and Sean Egan, which action the SEC officially commenced by the filing of an "Order Instituting Administrative and Cease-and-

Desist Proceedings, Pursuant to Sections 15E(d) and 21C of the Securities Exchange Act of 1934" (the "Administrative Proceeding" or "Enforcement Action") on April 24, 2012. *See* Administrative Proceeding, attached hereto as Exhibit A.   The SEC based the Enforcement Action primarily on alleged errors in Egan-Jones' 2008 registration application to the SEC to rate two additional classes of securities -- asset-backed securities ("ABS") and sovereign debt issues ("Sovereigns").

2.      In the wake of America's recent severe economic collapse, through both the Credit Agency Reform Act of 2006 ("Reform Act") and sections of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), both amendments to the Securities Exchange Act of 1934 ("Exchange Act") (an ameliorative measure in another dark time in our country's economic history), Congress strongly directed the SEC to encourage the development of independent ratings firms like Egan-Jones which are not paid by the issuer.

3.      Egan-Jones is the only independent Nationally Recognized Statistical Ratings Organization ("NRSRO") and is a small business with fewer than 20 employees. Egan-Jones is paid by its subscribers – not by the issuer. As a result, its sole economic motive is to provide its subscribers with the most timely, predictive, accurate and quality credit ratings in the industry. And it does so. Multiple academic studies, including two substantial studies issued in 2011, have shown that Egan-Jones' ratings are more timely, accurate and predictive than those issued by the large conflicted issuer-paid firms. Egan-Jones has caused no harm to the U.S. economy. To the contrary, Egan-Jones provides a critical, independent, no-nonsense voice to the market concerning credit quality.

2

4.      As reported widely, the damage recently done by the large issuer-paid firms, which have a virtual monopoly on the ratings industry, is almost incalculable. Congress has found that the large issuer-paid firms were instrumental in creating inflated and erroneous AAA ratings, for billions in profits to those firms, which fueled the ABS and collateralized-debt obligation ("CDO") market; which, when the market collapsed in 2008, it led to an estimated trillion dollars in losses and the largest financial crises since the Great Depression. The vast majority of the 2004-2007 ABS and CDO debt rated AAA by the large issuer-paid firms is now graded as junk.

5.      As the Congressional Findings published in the Dodd-Frank Act make clear:

> In the recent financial crisis, the ratings on structured financial products have proven to be inaccurate. This inaccuracy contributed significantly to the mismanagement of risks by financial institutions and investors, which in turn adversely impacted the health of the economy in the United States and around the world. Such inaccuracy necessitates increased accountability on the part of credit ratings agencies.

6.      As this Complaint makes unmistakably plain, a credit ratings agency ("CRA") that the SEC chose to hold "accountable" since 2008 is Egan-Jones -- the one small independent ratings firm that actually warned the capital markets of dangerously over-rated ABS and CDO debt and has long been a valuable independent bellwether of true credit quality. The Administrative Proceeding is the latest in a series of SEC actions which are designed to diminish and marginalize Egan-Jones while supporting and maintaining the *status quo* of an issuer-paid ratings agency monopoly in direct, indeed, striking contravention of specific Congressional direction in both the Reform Act and the Dodd-Frank Act. While the SEC targets Egan-Jones for alleged infractions which have not affected a single rating or

investor, the SEC has not suggested that it will ever take any real, proportional action against the large issuer-paid firms for issuing profitable inflated ABS and CDO ratings which brought about America's economic crises.

7.     Evidence of the SEC's bias against Egan-Jones and towards the large issuer-paid firms, includes, among other matters detailed in this Complaint, the SEC's decision to ignore the important division between its regulatory inspection and examination functions on the one hand, and non-public investigative and enforcement functions on the other, by designating members of the Office of Compliance, Inspections and Examinations ("OCIE") as officers of the SEC's Division of Enforcement ("Enforcement") while the OICE staff still were performing actively OCIE regulatory and examination functions.

8.     The SEC's bias towards the conflicted issuer-paid model and the large issuer-paid firms (which profit immensely from this conflict), and against Egan-Jones, evidences an agency unable to perform its duties in the impartial manner necessary to fulfill its quasi-judicial role in the context of this Administrative Proceeding.  In order for Egan-Jones and Mr. Egan to receive Due Process and Equal Protection in connection with the claims made by the SEC in its April 24, 2012 Administrative Proceeding, those claims need to be tried outside of the administrative process from which appellate review lies expressly and first with the SEC itself.  There is no benign, non-discriminatory explanation for this differential treatment of Egan-Jones.

9.     Egan-Jones and Mr. Egan therefore seek declaratory and injunctive relief to remove the Administrative Proceeding to this federal court. Such removal is necessary to prevent the violation of Egan-Jones' Due Process, Equal Protection and First Amendment

rights. This Enforcement Action, if allowed to proceed in an administrative forum, would deprive both Egan-Jones and Mr. Egan of their right to a jury trial and other critical procedural safeguards available in our judicial system, including, but not limited to, the ability to mount defenses and obtain evidence in support thereof relating to the unfair and disparate treatment of Egan-Jones by the SEC, with no rational basis, and evidence relating to the motive for the SEC to do so; the SEC's improper motive in bringing this action including the denial or marginalization of Egan-Jones' content and voice in the marketplace; and the maintenance and continuation of the *status quo* conflicted issuer-paid ratings model in contravention of Congressional direction. For the reasons set forth in this Complaint, Egan-Jones and Mr. Egan come before this Court and respectfully ask for declaratory and expedited judicial relief in the form of removal of the Enforcement Action to this Federal Court.

## II.    THE PARTIES

10.    **Plaintiff Egan-Jones** is an independent NRSRO with its headquarters in Haverford, Pennsylvania. Egan-Jones was founded by Sean Egan and Bruce Jones in December 1995, and established as an alternative to the large firms (Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings ("Fitch")) and to the issuer-paid ratings business model which they utilize. Egan-Jones's independent model is subscriber-paid.

11.    **Plaintiff Sean Egan** is a resident of Haverford, Pennsylvania and a founding principal of Egan-Jones. Mr. Egan, an MBA graduate from Harvard University, has 30 years

of credit analysis experience and is one of the foremost experts on credit quality in the nation.

12. **Defendant SEC** is a federal agency headquartered in Washington, D.C., charged with the responsibility of enforcing the federal securities laws and regulating the securities industry, with a stated mission "to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." The SEC was created by the Securities Exchange Act of 1934, 15 U.S.C. § 78d. The SEC first granted registration of Egan-Jones as a NRSRO as to three classes of ratings on December 21, 2007. The Administrative Proceeding takes no issue with Egan-Jones' credit ratings or its NRSRO designation in those three classes of securities.

### III.   JURISDICTION and VENUE

13. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1337, and 1346 and 5 U.S.C. § 702. Venue is proper pursuant to 28 U.S.C. §§ 1391(b).

### IV.   EGAN-JONES and SEAN EGAN

14. Egan-Jones, a company in the ratings business since 1995, is an important participant in the U.S. investment ratings market. The firm has consistently produced credit ratings with integrity. The timeliness and accuracy of Egan-Jones' ratings have been the subject of repeated scholarly analysis and found to be among the best in the industry. The existence of Egan-Jones in the marketplace creates competition, a stated Congressional objective in the Reform Act and the Dodd-Frank Act, and raises awareness of the serious conflicts of interest endemic to the business models of the larger ratings companies.

15.     Mr. Egan has more than 30 years of experience assessing credit quality and has long been an outspoken champion of the cause of independent ratings on Capitol Hill and in the media. Mr. Egan has long supported the independent ratings model as an un-conflicted, honest ratings methodology which protects investors. He has also supported Congressional efforts to reduce the overwhelming predominance of the conflicted issuer-paid model in the ratings industry, a virtual monopoly which has led to repeated adverse economic consequences for the U.S. financial markets.

A.   **Mr. Egan's Congressional Testimony**

16.     Mr. Egan is an outspoken critic of the issuer-paid model.  On June 25, 2003, Mr. Egan appeared before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises ("GSE"). During a hearing entitled "GSE Oversight: The Need for Reform and Modernization," he testified that Egan-Jones rated GSEs (Fannie Mae and Freddie Mac) at "A" and "A+" whereas the large firms rated GSEs at "AAA".  Mr. Egan shared his belief that there was significant pressure on the large ratings firms to maintain high ratings for the GSE issuers and little disincentive should their ratings prove wrong. *See* Sean Egan, Testimony before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, June 25, 2003, *available at* http://financialservices.house.gov/media/pdf/062503se.pdf.

17.     In 2005, three years before the height of the financial crisis, Mr. Egan provided important testimony before the Senate in support of the Reform Act.  There, he expressed concern over the "severe consolidation" and conflict-laden approaches of the large firms. *See* Senate Report, Sean Egan, Prepared Statement of Sean J. Egan before the Senate

Committee on Banking, Housing and Urban Affairs, *Examining the Role of Credit Rating Agencies in the Capital Markets,* Hearing, February 8, 2005, at 55, *available at* http://www.gpo.gov/fdsys/pkg/CHRG-109shrg28059/pdf/CHRG-109shrg28059.pdf.

18.     Mr. Egan's 2005 observations assisted in the enactment of the Reform Act. Citing Mr. Egan's examples of lack of competition in the industry and lagging creditworthiness ratings by the large issuer-paid firms, the Senate Report noted:

> All of the then-three NRSRO's-rated Enron at investment grade until only four days before default. Worldcom was rated investment grade debt until only 42 days prior to its bankruptcy filing.

Credit Rating Agency Reform Act of 2006, Senate Report at 8, *available at* http://www.gpo.gov/fdsys/pkg/CRPT-109srpt326/pdf/CRPT-109srpt326.pdf.   In contrast, Egan-Jones repeatedly downgraded Enron Corporation ("Enron") over a six-month period, from June 2001 through December 2001, from BBB+ to D.  *See* Comments on Proposed Rule Nationally Recognized Statistical Rating Organization, from Egan Jones to SEC, dated May 26, 2005, at 4, available at http://www.sec.gov/rules/proposed/s70405/eganjones052605.pdf.   Egan-Jones began to downgrade WorldCom, Inc. ("WorldCom") over ten months before its bankruptcy filing, and a full six months before either S&P or Moody's made any downgrade.  *Id.* at 5.

19.     The Senate Report further noted Mr. Egan's reference to California utilities, Global Crossing Ltd. ("Global Crossing"), AT&T Canada, and Parmalat SpA as "prominent examples" where the large issuer-paid NRSROs "failed to protect investors." Credit Rating Agency Reform Act of 2006, Senate Report at n.25.

20.    In his testimony before the House Committee on Oversight and Government Reform in 2008, Mr. Egan identified the market dominance and fee structure of the large firms as contributing to their failure to warn investors about the financial calamity in 2007. *See* http://oversight-archive.waxman.house.gov/documents/20081022102906.pdf at 2.   Mr. Egan noted that the large firms are responsible for 95% of global ratings, with the operating profit margin of Moody's exceeding 50%. *Id.* at 1-2.

**B.  Egan-Jones' Prescient Ratings**

21.    Egan-Jones' freedom from conflict and its dedication to timely and brutally honest ratings have enabled the firm to identify corporate credit changes significantly before the large firms. In many noteworthy instances, Egan-Jones was significantly ahead of the competition in issuing ratings predictions that differed markedly from those issued by the large firms for companies such as Enron, Global Crossing, WorldCom, General Motors Corp. ("General Motors" or "GM") (which Egan-Jones accurately predicted would go bankrupt years before it did so) and others.

22.    For example, as part of the overall credit analysis for the insurers Ambac Financial Group, Inc. ("Ambac") and MBIA Inc. ("MBIA"), Egan-Jones examined the securities and credit default swaps underlying their holdings since the firms provided default insurance on mortgages and mortgage backed securities ("MBS"). As a result, Egan-Jones was the first CRA to identify and accurately rate their credit-worthiness.  *See, e.g.,* "Moody's says it may cut Aaa ratings of Ambac, MBIA," Marketwatch, Wall Street Journal, *available at*   http://articles.marketwatch.com/2008-06-04/news/30746668_1_bond-insurers-mbia-and-ambac-ambac-financial ("MBIA shares slumped 16% to close at $5.63 after [Egan-Jones]

ratings agency's warning. Ambac dropped 17% to $2.49. Both stocks hit record lows. 'They have no future,' said Sean Egan, chief ratings officer at Egan-Jones Ratings, a rating agency that's paid by investors rather than issuers. 'They will argue otherwise but as a practical matter they don't have a future.' Egan-Jones has non-investment grade, or junk, ratings on MBIA and Ambac and began downgrading the bond insurers a year and a half ago, he noted.")

23.     Egan-Jones was also ahead of the other firms with respect to Bank of America ("BOA") and Countrywide. BOA had only a small amount of mortgage exposure prior to acquiring Countrywide and Merrill Lynch. BOA's acquisition of these two companies greatly increased its ABS default exposure causing Egan-Jones to downgrade BOA. Egan-Jones downgraded Countrywide well before the other CRAs in late 2006 and early 2007 when mortgage defaults began to show in the data but not on Countrywide's balance sheets.

24.     With respect to the Federal National Mortgage Association, Inc., often referred to as "Fannie Mae" ("FNMA"), and the Federal Home Loan Mortgage Corporation, often referred to as "Freddie Mac" ("FMCC"), Egan-Jones recognized long before other CRA's that these companies owned ABS debt which was defaulting and were also exposed through their guarantee of ABS debt. Furthermore, these firms were packaging and issuing their own ABS products. Egan-Jones withheld an AAA rating on Fannie Mae and Freddie Mac as early as 2001 on concerns of their ABS and mortgage debt.

25.     With respect to rating sovereign debt, Egan-Jones has also issued timely, accurate ratings well ahead of the large CRAs. Before the debt of countries such as Portugal, Italy, Greece and Ireland became headlines, Egan-Jones had analyzed and accurately rated

10

the debt risk of these sovereigns. Egan-Jones' sovereign ratings downgrades were more timely and accurate than the ratings of the same debt of those sovereigns issued by the large CRAs.

26.     On November 2, 2011, Egan-Jones issued a one notch downgrade of its credit rating of Jefferies Group, Inc. ("Jefferies") from BBB to BBB-. The decision resulted from concerns about Jefferies' ability to absorb capital and solvency repercussions of its sovereign debt obligations in the wake of the collapse of MF Global, an industry peer.  Four days after Egan-Jones issued the downgrade, Jefferies disclosed that it reduced by 49.5%, practically one-half, its sovereign exposure in Portugal, Italy, Ireland, Greece and Spain, valued at about $1 billion.  *Jefferies Cuts European Sovereign-Debt Holdings*, Wall Street Journal, Nov. 8, 2011.  Egan-Jones's one notch downgrade of Jefferies prompted a call to Egan-Jones from the OCIE, questioning the rating.[1]

### C. Recognition of the Importance of Egan-Jones' Ratings to the Investing Public

27.     Egan-Jones is a positive, essential and independent force in the marketplace, providing the earliest possible correct warnings and analysis to the market. Its importance to the market and to investors has long been recognized.

28.     In 2008, Fortune magazine rated Egan-Jones "Number One" among the top 8 "who saw the crisis coming." Katie Benner and Richard Tkaczyk*, 8 Who Saw the Crisis Coming*, Fortune, August 6, 2008. ("1. The Ratings Gadfly Sean Egan Egan-Jones Rating Company[,]" "A vocal critic of rivals Moody's, Fitch, and Standard & Poor's, Egan has a

---

[1] The Reform Act makes clear that "neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings."  15 U.S.C. §78o-7.

track record of warning investors about poor credit quality long before the Big Three ratings agencies. Most recently he said to shun subprime-mortgage-backed bonds even while the other agencies said these were investment-grade credits.")  The Wall Street Journal noted Egan-Jones' "maverick style" and deemed the new clients to Egan-Jones since 2007 as "a sign that many investors are determined to force a fundamental change in how ratings firms operate in the wake of the subprime mortgage blowups." Aaron Luchetti, *Tiny Firm Gives Ratings Giants Another Worry*, Wall Street Journal, Aug. 9, 2008. The CFA Institute commended Mr. Egan for his "straight talk on markets," making him a "relevant voice in the rating industry" who should receive "due credit for his early warnings on the financial crisis." Jonathan Barnes, *Solving the Credit Crisis*, CFA Institute May-June 2009.[2]

29.    In a recent article, the New York Times described Egan-Jones as "iconoclastic" noted its "bold calls about shaky credit prospects" and praised Mr. Egan as "prescient on some important calls about declining credit prospects, ahead of both the European financial crisis and the American mortgage and structured finance bubble before

---

[2] Egan-Jones has not just made important and early credit quality calls in ABS/CDO markets but in corporate securities as well.  In addition to the very early warnings on Enron, WorldCom and Global Crossing, all of which went bankrupt, Egan-Jones accurately predicted that General Motors would go bankrupt two years before it did so.  *See* "Rating Agencies Under Review for Downgrade" Nov. 29, 2008, Tom Sullivan, Barron's, *available at* http://www.egan-jones.com/featured ("Egan-Jones is one of the new NRSROs, and is paid by investors. It suggested to its long/short equity and credit investor-clientele that they short General Motors (GM) back on April 6, 2006, and warned that bankruptcy was possible. That, obviously, was a good call."); "Egan-Jones still sees eventual bankruptcy for GM," Dec. 19, 2008, Shawn Langlois, Market Watch, Wall Street Journal,  *available at*  http://articles.marketwatch.com/2008-12-19/news/30855190_1_credit-ratings-agency-federal-aid-cash-infusion ("Egan-Jones Rating Co. on Friday reaffirmed its lowly D rating on General Motors Corp.'s (US:gm) credit, even after the White House said it would provide $13.4 billion in federal aid, with another $4 billion likely in February. The credit ratings agency said the money will 'cushion the blow' but told its clients to watch for another bailout by President-elect Obama and an eventual bankruptcy filing.")  At the time Mr. Egan went public with this prediction, critics and the market in general failed to recognize the signs of GM's eventual collapse and Mr. Egan received much criticism.  The credit markets and investors desperately need honesty and independence, and Egan-Jones is the only NRSRO which legitimately can claim to be providing that service to the public because it is not paid by the issuer.

that." Jesse Eisinger, *Taking On the Little Guy, but Missing the Bigger Ones*, <u>New York Times</u>, May 2, 2012, *available at* http://dealbook.nytimes.com/2012/05/02/taking-on-the-little-guy-but-missing-the-bigger-ones.

### D. Independent Analytical Academic Studies Repeatedly Find that Egan-Jones' Ratings are More Predictive, Timely and Accurate than the Issuer-Paid Large Firms.

#### 1.   The 2003 Federal Reserve Study

30.     A 2003 report published by the Federal Reserve in Kansas City found:

> Overall, it is robustly the case that S&P's re-grades moved in the direction of EJR's earlier ratings. It appears more likely that this reflects systematic differences between the two firms' rating policies than a small number of lucky guesses by EJR. A comparison between S&P's and EJR's ratings show that, conditional on S&P's upgrading or downgrading a firm, its new grade was correlated with the grade EJR had awarded at least ten weeks earlier….It also reflects that S&P's large downgrades do not occur immediately after negative surprises to firms, but rather after a steady accumulation of bad news which EJR's ratings previously reflected.

Richard, Johnson*, An Examination of Rating Agencies Around the Investment Grade Boundary*, Research Division, Federal Reserve Bank of Kansas City (Feb. 2003), *available at* http://www.kc.frb.org/publicat/reswkpap/pdf/rwp03-01.pdf.

#### 2.   The 2003 Stanford Study

31.     In another study jointly published in 2003 by the Stanford Graduate School of Business and Michigan University's Ross Business School (and revised in 2006), the authors noted that:

> Credit ratings from Egan-Jones more accurately reflect information in the marketplace and are frequently up to 237 days ahead of actions taken by Moody's and S&P….The powerful market incentives resulting from the investor supported, independent business model of Egan-Jones Ratings Company produces more timely and accurate ratings with predictive value.

Beaver, W., Shakespeare, C., *Differential Properties and Accuracy in the Ratings of Certified vs. Non-Certified Bond Rating Agencies,* (Abstract) (2003, rev'd 2006), *available at* www.egan-jones.com/studies.

### 3.     The 2011 Ratings Inflation Study

32.     Gunther Strobl and Han Xia, of the University of North Carolina Business School at Chapel Hill and the School of Management, University of Texas at Dallas, respectively, published a study that provides significant, empirical evidence that the conflict of interest inherent in the issuer-pay ratings model in fact leads to inflated corporate credit ratings. Gunther Strobl and Han Xia, *The Issuer-Pays Rating Model and Ratings Inflation: Evidence from Corporate Credit Ratings* (Nov. 2011) ("Ratings Inflation Study") *available at* https://fisher.osu.edu/blogs/efa2011/files/APE_8_2.pdf.   Egan-Jones did not request that the authors conduct the study or pay for the study. Egan-Jones did provide Egan-Jones ratings information requested by the authors.

33.     The study compares the ratings of S&P with those of Egan-Jones under various parameters and concludes that, not only are issuer-paid corporate ratings generally inflated, but the inflation is more pronounced when the conflict of interest is particularly severe.  The study also concludes that issuers with more short term debt or a newly appointed CEO or CFO, or which have a lower percentage of past bond issues rated by S&P, are significantly more likely to receive an inflated rating from S&P.

34.     The Ratings Inflation Study uses Egan-Jones as a comparison benchmark, as a 2006 study found that "EJR reacts more timely in changing its ratings than Moody's, and

EJR's ratings changes are followed by stronger marked reaction," suggesting that Egan-Jones provided more informative ratings than the issuer-pay major rating agencies. *Id.* The authors also supplemented the 2006 study with their own analysis of Egan-Jones and S&P default prediction accuracy, "the most important credit event," *id.* at 6-7, leading them to the independent conclusion that Egan-Jones' ratings "are more informative" than S&P's ratings. *Id.* at 6.

35.     The Ratings Inflation Study finds that the issuer-paid ratings agencies inflate ratings to various degrees depending on the nature of the conflicts of interest arising from the issuer-paid model, and that the ratings inflation "is both statistically and economically significant." *Id.* at 23.

36.     The Ratings Inflation Study concludes:

> These findings raise questions about the value of credit ratings. Our findings shed light on the continuing debate over whether the issuer-pays compensation model distorts rating agencies' incentives. They also provide policy implications that regulators' intervention and effort to promote a more transparent rating industry will benefit investors, and can potentially lead to improvement in social welfare.

*Id.*

### 4.     The 2011 Compensation Structure Study

37.     Valentina Bruno and Kimberly Comaggia of the Kogod School of Business at American University and Jess Comaggia at the Kelley School of Business at Indiana University co-authored and released recently a study analyzing whether the NRSRO designation itself ultimately affected ratings quality or whether ratings quality resulted from compensation structure.   Valentina Bruno, Jess Comaggia and Kimberly Comaggia, *The*

*Information Content of Credit Ratings: Compensation Structure Does Matter* (Nov. 2011) ("Compensation Structure Study"), *available at* http://www.egan-jones.com/studies. Egan-Jones did not request that the authors conduct the study or pay for the study. Egan-Jones did provide Egan-Jones ratings information requested by the authors.

38.     The authors summarized their Study results as:

> [T]he investor paid agency produces ratings that are more timely and symmetric compared to those produced by a traditional, issuer-paid agency. These differences are significant before and after the investor paid agency received the NRSRO designation, suggesting they are a result of the rater's different compensation structures rather than the government's certification. Our results indicate that although the recent Dodd-Frank legislation mitigates the importance of the NRSRO designation, the designation itself is less important than the source of rater compensation.

*Id.* at Abstract.

39.     Based on their study of the data:

> We find robust evidence that EJR's ratings policy - symmetric with respect to good and bad information and timelier relative to Moody's ratings - persists in the sample period after it received the NRSRO designation....Second, among ratings changes, the proportions of upgrades and downgrades suggest less ratings inflation by EJR and significantly more symmetric (asymmetric) responses to good and bad information by EJR (Moody's) in both time periods....These proportions remain virtually unchanged across pre-and post-NRSRO time periods and we more rigorously confirm these patterns with Granger causality tests....Overall, the body of evidence indicates EJR continued to produce more timely and symmetric information relative to Moody's, and did not adjust its ratings policy to accommodate issuer re-contracting or regulatory concerns, after it became an NRSRO....We are left to conclude that the more timely and symmetric ratings produced by EJR, relative to ratings produced by Moody's, follows from EJR's independence from issuing firms.

*Id.* at 3-5.

40.    Using empirical data to determine that Egan-Jones did not change its ratings policy after its designation as an NRSRO, *id.* at 17-18, the Study then analyzed whether Egan-Jones simply issues more conservative ratings. *Id.* at 19. The authors found the empirical evidence to the contrary. The data they studied shows that the differences between the ratings issued by Egan- Jones and Moody's "do not reflect general pessimism on the part of EJR." *Id.* at 19.

41.    With respect to timeliness, "EJR's ratings changes tend to lead those of Moody's both before and after EJR received the NRSRO designation." *Id.* at 22. "EJR's downgrades have a stronger Granger causality effect on Moody's downgrades than vice versa," a relation which the authors found did not change after Egan-Jones received its NRSRO designation.  *Id.* at 24. These results indicate that "if anything, Moody's downgrades became less timely in explaining EJR's downgrades after EJR received the NRSRO designation. Overall, the results ... indicate EJR produces timelier credit ratings than Moody's, and since this relation maintains before and after EJR received the NRSRO designation, is not a result of the NRSRO designation…." *Id.* at 24.   Moreover, "EJR's upgrades are timelier than Moody's upgrades and this relation is not a result of the NRSRO designation." *Id.* at 25.

42.    The Compensation Structure Study concludes as follows:

Our results confirm that the information contained in EJR ratings is both more timely (ratings adjust to incorporate information quickly) and symmetric (ratings adjust symmetrically to good and bad news) than the information contained in Moody's ratings….We hypothesize that raters compensated by issuers face a fundamentally different incentive structure than those compensated by investors….Our results should be of interest to a host of market participants, regulators, and academic researchers. Credit ratings affect

17

capital allocation in multiple ways, including information provision for retail investors, low cost contracting mechanisms for a host of counterparties, and regulatory compliance by institutional investor….[F]or timely credit risk metrics in regulation, investment, and research, our results commend investor paid credit analysis.

*Id.* at 31-32.

## V. CONGRESS HAS REPEATEDLY DIRECTED THE SEC TO ENHANCE AND ENCOURAGE COMPETITION IN THE RATINGS INDUSTRY BY INDEPENDENT FIRMS IN ORDER TO WEAKEN THE ISSUER–PAID MONOPOLY FOR THE BENEFIT OF MORE ACCURATE RATINGS AND THE INVESTING PUBLIC.

43.     Through passage of the Reform Act and the Dodd-Frank Act, Congress directed that the principal goals of ratings agency regulation are to encourage competition and reduce the corrupting effects of the conflicted issuer-paid ratings agency business model with the ultimate purpose of encouraging and fostering the production of credit ratings of quality, integrity and accuracy. Credit Rating Agency Reform Act of 2006 §2, 15 U.S.C. §78o-7 note, Pub. L. No. 109-291 (2006) ("An Act to improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry"); *id.* at §2(5) ("The two largest credit rating agencies serve the vast majority of the market, and additional competition is in the public interest"); Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, §931, Pub. L. No. 111-203 (2010).

### A.  The Credit Agency Reform Act of 2006

44.     On February 8, 2005 and March 7, 2006, the Senate Committee on Banking, Housing and Urban Affairs held hearings leading up to the Reform Act.  The Introduction to

the Senate Report on the Reform Act from the Committee on Banking, Housing and Urban

Affairs, states as follows:

> In the wake of highly publicized failures by the large credit agencies to warn investors in a timely manner about the impending bankruptcies of Enron, WorldCom, and others, the Congress, in section 702(b) of the Sarbanes-Oxley Act of 2002, directed the [SEC] to examine the role and performance of ratings agencies, barriers to entry into the rating industry, and conflicts of interest plaguing rating agencies….NRSROs have been criticized by a broad array of interested parties with respect to conflicts of interest, ratings that significantly lag the markets, and anticompetitive and abusive business practices.

Reform Act, Senate Report at 1.

45.     The principal concerns were that some (if not most) of the NRSROs (a) had

conflicts of interest, (b) had ratings that significantly lag the markets and (c) engaged in anti-

competitive and abusive business practices.  *Id.* at 2.  The Senate Report noted that "S&P and

Moody's wield enormous power in the global capital market system." *Id.* at 3. The Senate

noted that certain regulatory actions and policies "tended to insulate industry leaders from

competition" and that, as of the date of the Report, there were only five NRSROs: S&P,

Moody's, Fitch, Dominion Bond and AM Best Company. *Id.* at 3-4.

46.     The industry was extremely concentrated, with S&P and Moody's occupying

80% of the industry market share as measured by revenues.  These two companies rated more

than 99% of the debt obligations and preferred stock issues publicly traded in the United

States.  *Id.* at 4.

47.     The Senate Report concluded that the NRSROs were "not providing investors

with timely and accurate ratings," and that the "business model for the dominant ratings

agencies [was] inherently conflicted." *Id.* at 8.  That model, used by the most powerful and influential NRSROs, relies upon debt issuers paying the ratings agencies for their ratings.

48.     The stated purpose of the Reform Act, as set forth in the Preamble to the statute, was "to improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating industry."  *See* http://www.govtrack.us/congress/bills/109/s3850.

49.     The Reform Act established "fundamental reform and improvement of the designation process," with an aim towards "encouraging purely statistical models to compete with the qualitative models of the dominant rating agencies <u>and investor subscription-based models to compete with fee-based models</u>."  S. REP. 109-326, 7, 2006 U.S.C.C.A.N. 865, 872 (emphasis added).

**B.  <u>The Dodd-Frank Wall Street Reform Act of 2010</u>**

50.     At the beginning of the subsection of the Dodd-Frank Act entitled "Improvements to the Regulation of Credit Rating Agencies," Congress reported its findings that:

> In certain activities, particularly in advising arrangers of structured financial products on potential ratings of such products, credit rating agencies face conflicts of interest that need to be carefully monitored and that therefore should be addressed explicitly in legislation in order to give clearer authority to the Securities and Exchange Commission.
>
> In the recent financial crisis, the ratings on structured financial products have proven to be inaccurate. This inaccuracy contributed significantly to the mismanagement of risks by financial institutions and investors, which in turn adversely impacted the health of the economy in the United States and around

the world. Such inaccuracy necessitates increased accountability on the part of credit rating agencies.[3]

51.    In the Dodd-Frank Act, Congress directed the SEC to consider the regulatory

burden on the smaller, independent NRSROs like Egan-Jones. Dodd-Frank Act §932(a)(4)

(The SEC "shall issue rules to prevent the sales and marketing considerations of a nationally

recognized organization from influencing the production of ratings by the nationally

recognized statistical organization" which rules should "provide for exceptions for small

nationally recognized statistical rating organizations with respect to which the Commission

determines that the separation of the production of ratings and sales and marketing activities

is not appropriate."); §932(a)(5) ("The Commission may exempt a small nationally

recognized statistical rating organization from the limitations [regarding designation of a

compliance officer], if the Commission finds that compliance with such limitations would

impose an unreasonable burden on the nationally recognized statistical"); §932(a)(8) ("If the

Commission finds that compliance with the provisions of this subsection [regarding

composition of the Board of Directors] present an unreasonable burden on a small nationally

recognized statistical rating organization, the Commission may permit the nationally

recognized statistical rating organization to delegate such responsibilities to a committee that

includes at least one individual who is a user of ratings of a nationally recognized statistical

rating organization"); *see* James Gellert, Testimony before the House Committee on

Financial Services, Subcommittee on Oversight and Investigations, Hearing, July 27, 2011, at

2, *available at* http://financialservices.house.gov/UploadedFiles/072711gellert.pdf ("Dodd-

---

[3] In this regard, there is no claim anywhere that a single rating of Egan-Jones, out of thousands of ratings, ever harmed the investing public, was conflicted or corrupted by influence.

Frank has some positive elements for effective change in this industry, but it also gets bogged down in window dressing that ultimately does little except apply a disproportionate burden on the small NRSROs while providing little more than an administrative hassle to the Big Three.").

52.     Section 939D of the Dodd-Frank Act required the GAO and the SEC to study alternative means for compensating NRSROs and to establish a system to determine initial credit ratings and monitor the ratings of structured finance products.  The details of the progress made as to this study are detailed *infra* at paragraphs 97 to 99.

53.     Section 939C of the Dodd-Frank Act mandated that the SEC conduct and issue a "STUDY ON STRENGTHENING CREDIT RATING AGENCY INDEPENDENCE" to focus on:

1.     the independence of nationally recognized statistical rating organizations; and

2.     how the independence of nationally recognized statistical rating organizations affects the ratings issued by the nationally recognized statistical rating organizations.

With the designated "SUBJECTS FOR EVALUATION":

1.     the management of conflicts of interest raised by a nationally recognized statistical rating organization providing other services, including risk management advisory services, ancillary assistance, or consulting services;

2.     the potential impact of rules prohibiting a nationally recognized statistical rating organization that provides a rating to an issuer from providing other services to the issuer; and

3.     any other issue relating to nationally recognized statistical rating organizations, as the Chairman of the Commission determines is appropriate.

22

54.     The Dodd Frank Act imposed a timeline for the "STUDY ON STRENGTHENING CREDIT RATING AGENCY INDEPENDENCE" that:

> Not later than 3 years after the date of enactment of this Act [July 21, 2010], the Chairman of the Commission shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report of the results of the study conducted ... including recommendations, if any, for improving the integrity of ratings issued by nationally recognized statistical rating organizations

55.     To date, the SEC has not issued the study or the report on the study, and the SEC's website for "Implementing Dodd-Frank Wall Street Reform and Consumer Protection Act — Upcoming Activity" reflects that dates are "still to be determined" as to the Dodd Frank Act §939C report. *See* http://www.sec.gov/spotlight/dodd-frank/dfactivity-upcoming.shtml. Nearly two years of the three-year time window have elapsed for not only completing the study but also for reporting to Congress on the results thereof. There are no publicly available details of the study or indication of when such details will be made available, when the study will be completed or when the report will be submitted.

56.     The importance of this required study is that Congress recognized that there are significant issues with the large firms, and has mandated the SEC, which has historically coddled and excused the large firms, to take a careful look at the conflicts which arise from the issuer-paid model.

57.     Section 968 of the Dodd Frank Act, entitled "Study on SEC Revolving Door" directed the Comptroller General to conduct a study to be completed within one year that would:

1.      review the number of employees who leave the Securities and
        Exchange Commission to work for financial institutions regulated by
        such Commission;

2.      determine how many employees who leave the Securities and
        Exchange Commission worked on cases that involved financial
        institutions regulated by such Commission;

3.      review the length of time employees work for the Securities and
        Exchange Commission before leaving to be employed by financial
        institutions regulated by such Commission;

4.      review existing internal controls and make recommendations on
        strengthening such controls to ensure that employees of the Securities
        and Exchange Commission who are later employed by financial
        institutions did not assist such institutions in violating any rules or
        regulations of the Commission during the course of their employment
        with such Commission;

5.      determine if greater post-employment restrictions are necessary to
        prevent employees of the Securities and Exchange Commission from
        being employed by financial institutions after employment with such
        Commission;

6.      determine if the volume of employees of the Securities and Exchange
        Commission who are later employed by financial institutions has led to
        inefficiencies in enforcement;

7.      determine if employees of the Securities and Exchange Commission
        who are later employed by financial institutions assisted such
        institutions in circumventing Federal rules and regulations while
        employed by such Commission;

8.      review any information that may address the volume of employees of
        the Securities and Exchange Commission who are later employed by
        financial institutions, and make recommendations to Congress; and

9.      review other additional issues as may be raised during the course of
        the study conducted under this subsection.

58.     The study is extremely important and has significant implications for this Enforcement Action and Egan-Jones' claims in this Compliant. By requiring this study, Congress recognized that the revolving door between and the SEC and the large NRSROs could well influence and bias the SEC's consideration of the independent firms and, conversely, its treatment of the large firms. This Complaint asserts that the hallmarks of institutional bias are evident and have played out to very practical effect here – just as Congress supposed. In fact, one of the OCIE examiners during the March 2012 onsite exam, discussed *infra*, was a staff person who recently joined the OCIE's staff after working at a large ratings firm.

**VI.     THE DISPARATE TREATMENT OF EGAN-JONES BY THE SEC, THE SEC'S DEVIATION FROM ITS NORMAL PRACTICES AND POLICIES IN THE INVESTIGATION OF EGAN-JONES AND THE SEC'S ABJECT FAILURE AND/OR REFUSAL TO COMPLY WITH TWO CONGRESSIONAL DIRECTIVES RELATING TO ITS TREATMENT AND ENCOURAGEMENT OF INDEPENDENT FIRMS EVIDENCES A PROFOUND INSTITUTIONAL BIAS AGAINST EGAN-JONES AND INDEPENDENT CREDIT RATINGS FIRMS GENERALLY.**

59.     Egan-Jones has been subjected by the SEC to relentless regulatory inquiry and investigations and the Enforcement Action for alleged application errors which affected no rating and harmed no one.  But the SEC has given a pass to the large CRAs, whose ABS, RMBS and CDO ratings for large profits played a significant role in the 2008 financial crises and led to huge losses which have affected millions of Americans.

**A. The SEC's Disparate Treatment of the Large Firms Versus Egan-Jones is Obvious, Remarkable and Patent.  It Evidences the SEC's Bias and Unfair Treatment of Egan-Jones and The Independent Ratings Model.**

60.     The SEC historically has condoned, excused, remained silent or, at worst, very gently and gingerly reprimanded the large firms for conduct which corrupted the ratings process and negatively affected investors and the market.

### 1.     The 2002 SEC 21(a) Report of Investigation

61.     On March 19, 2002, according to Congressional reports, the SEC issued an Order entitled "Order In the Matter of the Role of Rating Agencies in the U.S. Securities Markets Directing Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934, and Designating Officers for Such Designation"  Committee on Banking, Housing and Urban Affairs Report, dated September 6, 2006, at 5-6, available at http://www.gpo.gov/fdsys/pkg/CRPT-109srpt326/html/CRPT-109srpt326.htm.   The SEC's examination revealed numerous problems including: (1) potential conflicts of interest arising from the issuer-paid business model; (2) the firms' marketing of supplementary fee-based services exacerbated those conflicts; (3) given their substantial power in the marketplace, there was significant potential to pressure issuers to pay for ratings and ancillary services (continuing the conflict); and (4) evidence existed relative to insufficient protection of confidential information. *Id.*  In addition, the SEC found an "overall lack of cooperation ... with respect to document production" by the large firms during the investigation.  *Id.*  The SEC examiners also conveyed that the large firms may have violated one of the antifraud provisions of the Securities Act of 1933, specifically section 17(b), with respect to the

26

disclosure of fees from issuers. *Id.* The SEC did not bring an administrative or civil injunctive enforcement action against S&P, Moody's or Fitch.

### 2.    The 2008 SEC Report on Select Credit Agencies

62.    In August 2007, OCIE initiated examinations of the large CRAs to review their role in the then-recent turmoil in the subprime mortgage-related securities markets.

63.    In July 2008, the SEC issued its "Summary Report of Issues Identified in the Commission Staffs Examinations of Select Credit Rating Agencies" (the "2008 Report") *available at* http://www.sec.gov/news/studies/2008/craexamination070808.pdf.    This 37-page report covered the period January 2004 to July 2008 and focused on the dramatic errors and oversights in the large firms' ratings for subprime residential mortgage-backed securities ("RMBS") and CDOs.

64.    In preparing the Summary Report, the SEC analyzed the revenues generated by the large firms' participation in rating subprime securities, both RMBS and CDOs. The SEC found that, beginning in 2003, revenues from RMBS credit ratings increased, for one agency, 50% in 2003 to almost 250% in 2006 and, for another agency, 25% in 2003 to approximately 180% in 2006.   The increase in revenues from rating CDO subprime debt increased approximately 1,000% from 2003 until 2006 for one and approximately 700% for another. For the two largest CRAs, assessing creditworthiness of subprime mortgage debt, and getting paid by the issuer of that debt to do so, was extremely lucrative.   2008 Report at 11, 32.

65.    Comments by analysts indicating that they knew the ratings grossly understated the risk (*i.e.*, the ratings model did not capture "half" of the deal risk, or that

these extraordinarily lucrative subprime deals were in fact a "house of cards"), were characterized by the SEC as merely reflecting "struggles to adapt to the increase and the volume and complexity of the deals." *Id.* at 12, n.8.

66.     The SEC noted significant deficiencies in the resources devoted to handling the RMBS and CDO areas. Between 2002 and 2006, the volume of RMBS and CDO deals rated by the large firms increased significantly in both volume and complexity. *Id.* at 10-12. The evidence clearly showed that insufficient resources were devoted to properly assessing these deals and their risks. *Id.* at 12. In that regard, the large firms were also deficient in their on-going surveillance of the ratings on these investment vehicles.

67.     The SEC found numerous document creation and retention lapses as well as failures in disclosure. For instance, the SEC found that "relevant ratings criteria were not disclosed." 2008 Report at 13.

68.     Certain significant aspects of the ratings process and the methodologies used to rate RMBS and CDOs were either not disclosed or not fully disclosed. *Id.* Some of these lapses appear to arise directly from the problems endemic to the issuer-paid model.  For instance, one rating agency reduced its model's raw loss outputs for second lien loans and adjusted its internal matrices, "depending on the issuer and the raw loss numbers." That agency did not publicly disclose its use of such matrices to adjust its model. Another firm utilized unpublished models to assess data, while an agency published a "criteria report" that was no longer even being used in its rating process. *Id.* at 13-14.

69.     In rating RMBS and CDOs, the large firms routinely deviated from their models ("out of model adjustments") and failed to document the rationale for the deviation.

*Id.* at 14. In that regard, one agency regularly reduced loss expectations on subprime second lien mortgages from those in its model without disclosing the override. *Id.* One firm said that it did not adjust collateral or cash flow analysis based upon any factors not incorporated into the model -- yet the firm's file showed that, in fact, it did so. *Id.*

70.     The SEC also found lapses in the policies and procedures for rating RMBS and CDOs. Indeed, "none of the rating agencies examined had specific written procedures for rating RMBS and CDOs." *Id.* at 16. "The lack of full documentation of policies and procedures made it difficult for the staff to confirm that the actual practice undertaken and individual ratings were consistent with the firm's policies and procedures. This lack of full documentation could also impede the effectiveness of internal and external auditors conducting reviews of ratings agencies activities." *Id.* at 16-17.

71.     Nor did the rating agencies "appear to have specific policies and procedures to identify or address errors in the models or methodologies." *Id*. at 17. The SEC made clear that these agencies were "required to make and retain records relating to its business" and that the rules "applied to these rating agencies in September 2007." *Id.*

72.     The SEC found that the large firms failed to document significant steps in the ratings process, including the rationale for deviation from their models or for ratings committee actions and decisions, and that they failed to document significant participants in the ratings process. 2008 Report at 19.  The SEC reported that its examination staff found "that the ratings agencies exam did not always fully document certain significant steps in their subprime RMBS and CDOs ratings process. This made it difficult or impossible for

29

commission examiners to assess compliance with their established policies and procedures, and to identify the factors that were considered in developing a particular rating." *Id.*

73.    There was also a failure to properly document committee actions and decisions and occasions where the ratings agencies "failed to follow their [own] internal procedures and document their ratings analyst and/or ratings committee participants who approved the credit ratings." *Id.* at 20.

74.    The 2008 Report noted that deviations from the model or out-of-model adjustments were not documented, *id.* at 19-20, and that, of course, extraordinary conflicts of interest inherent in the issuer pays model corrupted the ratings process. *Id.* at 23-27. The 2008 Report noted that these rating agencies allowed key participants in the ratings process to participate in fee discussions, that analysts were aware of the rating agencies' business interests in securing the rating of the deal, that individuals rating the subprime debt were aware of considerations of market share and other business considerations of the ratings agency, and credit rating analysts' overall compensation was determined in part by the overall financial profit of the firm. *Id.* at 27.

75.    At one firm, analytical staff was privy to concerns about generating fees from issuers in discussing whether to make certain changes in ratings methodology. Employers openly discussed the firm's market share relative to whether they would lose business. *Id.* at 25. Email correspondence clearly linked ratings analysts to business generation and revenue. *Id.* at 24 – 26, nn.38-47. The SEC also examined the policies and procedures with respect to employees' personal securities holdings and found they varied in how vigorously they monitored or prevented prohibited transactions, including personal trading. *Id.* at 28-29. The

SEC also examined internal audit processes and found one program non-compliant. *Id.* at 29-30.

76.     The SEC concluded that the individuals who underwrite and structure the RMBS and CDO subprime offerings "have substantial influence over the choice of rating agencies hired to write the deals." *Id.* at 31.

77.     The SEC's response to this deliberate conduct, which had significant negative and long lasting consequences to the markets and public, was merely to suggest that these agencies "**take steps to improve their practices, policies and procedures with respect to rating RMBS and CDOs and other structured finance securities.**" The SEC even applauded "[e]ach credit rating agency" for being "**cooperative in the course of these examinations**" and for "**commit[ing] to taking remedial measures to address the issues identified**." 2008 Report at 37 (emphasis added).  The SEC did not bring any administrative or civil injunctive enforcement action.

### 3.     The 2009 SEC Report on NRSROs

78.     In its Findings associated with passage of the Reform Act in 2006, Congress concluded that "credit ratings are of national importance … [and] the two largest credit rating agencies serve the vast majority of the market and additional competition is in the public interest." Reform Act at Findings. That concern was prescient as those firms, Moody's and S&P, rated three-fourths of the ABS debt issuances rated by all NRSROs in 2008. *See* "Annual Report on Nationally Recognized Statistical Rating Organizations," SEC, September 2009 ("2009 Report") at 9, *available at* http://www.sec.gov/divisions/marketreg/ratingagency/nrsroannrep0909.pdf.

79.     In its 2009 Report, the SEC noted that the large firms have been described as a "duopoly" or "partner-monopoly" and maintain that position in the credit rating business to date. *Id.* at 13. The issuer-paid model firms generate 99% of the credit ratings issued. *Id.* at 10.  In 2008, total revenue received by all CRAs was $3.86 billion, *id.* at 12, 97% of which went to the largest firms.

80.     The 2009 Report notes that:

the assignment of high credit ratings to many RMBS and CDO's securities in recent years followed by the scope and magnitude of subsequent downgrades during the current credit crises has resulted in the loss of confidence among investors in the reliability of credit ratings issued by the largest NRSRO's in this sector. This lack of confidence in the accuracy of NRSRO ratings has been a factor in the broader dislocation[4] in the credit markets.

*Id.* at 16.

81.     The failure of the quality and integrity of the NRSRO ratings, specifically, the hyper-inflated credit ratings on ABS and RMBS issued by the largest CRAs, led directly to the lack of confidence cited and were a significant factor in the "broader dislocation in the credit markets."

82.     The 2009 Report states:

In the credit rating industry, conflicts of interest may arise from a number of activities, including the manner of compensation, the provision of consulting or advisory services, and business relationships and affiliations. Reducing the barriers to entry in the market for providing NRSRO ratings and, hence, increasing competition, may, in fact, reduce conflicts of interest in substantive ways. This market disciplining mechanism will be less effective the more

---

[4] The words "broader dislocation" is the SEC's euphemism for the economic collapse of 2008 in which 8.4 million people lost their jobs, *see, e.g.*, "Long-Term Unemployment in the Great Recession: Testimony for the Joint Economic Committee, U.S. Congress Hearing on 'Long-Term Unemployment: Causes, Consequences and Solutions,'" Lawrence F. Katz, Department of Economics, Harvard University, at 2, *available at* http://www.economics.harvard.edu/faculty/katz/files/jec_testimony_katz_042910.pdf, and total losses exceeded a trillion dollars.

difficult it is for investors to determine the true credit quality of the rated debt security or obligor.

*Id.* at 19.

83.     The 2009 Report notes that "economies of scale and sunk costs may be economic factors which may favor the larger, long established rating agencies" since those agencies "can allocate the cost of," among other things, "legal, compliance… across a wider range of ratings providing a more efficient cost base." *Id.* at 15.[5]

### 4.     The 2011 Levin Senate Report - "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse"

84.     In April 2011, the Senate's Permanent Subcommittee on Investigations wrote in detail regarding how the two largest CRAs almost single-handedly brought down America's economy. *See* "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse," Carl Levin, Chairman of the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs ("Levin Report"), *available at* http://www.ft.com/cms/fc7d55c8-661a-11e0-9d40-00144feab49a.pdf.    In fact, the Levin Report concludes "that the most immediate trigger to the financial crisis was the July 2007 decision by Moody's and S&P to downgrade hundreds of [RMBS] and [CDO] securities." Levin Report at 45.

85.     The Levin Report provided this recapitulation of the SEC's 2008 Report:

[T]here was a substantial increase in the number and in the complexity of RMBS and CDO deals, significant aspects of the ratings process were not always disclosed, the ratings policies and procedures were not fully

---

[5] Plainly, huge size and giant budgets for legal and compliance have no relationship to credit ratings accuracy, quality or integrity, or whether the inherent conflict of interest will manifest itself in ratings corruption.  This is precisely why Congress has directed studies of these issues as well as the SEC-large firm revolving door.

documented, the surveillance processes used by the rating agencies appear to have been less robust than the processes used for initial ratings, and the rating agencies' internal audit processes varied significantly. In addition, the report raised a number of conflict of interest issues that influenced the ratings process, noted that the rating agencies failed to verify the accuracy or quality of the loan data used to derive their ratings, and raised questions about the factors that were or were not used to derive the credit ratings.

*Id.* at 315 (internal quotations and citations omitted).

86.     The Levin Report confirmed that the large firms maintained inordinately high ratings long after concerns of the creditworthiness of these securities were well known to and had already permeated the marketplace. These firms then suddenly downgraded these securities to junk status. *Id.* at 6, 30-31, 243-46.   The Levin Report further noted that the three largest NRSROs still were providing AAA ratings on securities which, within 30 days, were suddenly downgraded to junk status.  *Id.* at 6, 243, 246.

87.     The Report concluded specifically that:

Inaccurate AAA credit ratings [by Moody's and S&P] introduced risk into the U.S. financial system and constituted a key cause of the financial crisis. In addition, the July [2007] mass downgrades, which were unprecedented in number and scope, precipitated the collapse of the RMBS and CDO secondary markets, perhaps more than any other single event triggered the beginning of the financial crisis….

The ratings agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom.

Additional factors responsible for the inaccurate ratings include rating models that failed to include relevant mortgage performance data, unclear and subjective criteria used to produce ratings, a failure to apply updated rating models to existing rated transactions, and a failure to provide adequate staffing to perform rating and surveillance services, despite record revenues….

34

It was not in the short term economic interest of either Moody's or S&P [to incorporate into their ratings the adverse information known to them] to provide accurate credit ratings for high risk RMBS and CDO securities, because doing so would have hurt their own revenues. Instead, the credit rating agencies' profits [under the 'issuer pays' model] became increasingly reliant on the fees generated by issuing a large volume of structured finance ratings. In the end, Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued mass downgrades that shocked the financial markets, hammered the value of the mortgage related securities, and helped trigger the financial crisis.

*Id.* at 6-7.

88.     The summary findings, *id.* at 5-7, and the exacting detailed analyses and findings of the Levin Report, *id.* at 243-317, raise the patent and obvious question of why the SEC has declined to suspend or revoke Moody's and S&P's ability to issue ratings as an NRSRO of ABS debt.  Notwithstanding the SEC's failure to bring an administrative or civil injunctive enforcement action, or even consider doing so, against Moody's or S&P, the SEC has targeted Egan-Jones' ABS and sovereign ratings classes based on alleged 2008 application errors which harmed no one.

### 5.     The SEC's 2010 Report of Investigation of Moody's

89.     On August 31, 2010, the Commission issued a Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: Moody's Investors Service, Inc." (http://www.sec.gov/litigation/investreport/34-62802.htm.) ("Moody's 21(a) Report"), in which it reported that in early 2007, Moody's had used a faulty error code to rate constant proportion debt obligation ("CPDO") notes, thereby erroneously elevating the credit rating for those notes to AAA. The amount of the issue which Moody's rated as AAA was just under $1 billion.  The error came to the attention of Moody's ratings committee and

other executives who decided, for economic and reputational and, perhaps, liability reasons, not to disclose it.

90.     According to the Moody's 21(a) Report, when Moody's applied for its NRSRO registration later in 2007, it failed to disclose this error, failed to disclose the flawed methodology underlying these CPDO ratings, and violated Moody's "Core Principles" policies and procedures which were part of said application.

91.     The Moody's 21(a) Report further reflected that, in 2008, when Moody's began to downgrade this issuance, it did so by omitting the material fact that the original rating was erroneously inflated in the first place thereby concealing the original error. In May 2008, the press uncovered the error.

92.     For this conduct, as set forth in the Moody's 21(a) Report, which clearly misled and harmed the market and actual investors in this debt and directly affected its 2007 registration application, the SEC elected to issue a "21(a) Report" as the appropriate disposition, rather than bring an enforcement action as an administrative proceeding or civil injunctive action.  The SEC wrote in the Moody's 21(a) Report that Moody's submitted a false NRSRO application, engaged in "deceptive ratings conduct," considered "inappropriate non-credit related factors" in its affirmative decision to conceal the coding error, concealed its failure to downgrade, did not follow its model, and had defective internal controls.  The SEC clearly understood that the notional value of the debt was "just under $1 billion." *Id.*

93.     Notwithstanding the SEC's affirmative statements that Moody's concealed and engaged in "deceptive" conduct, the SEC declined to charge Moody's with fraud or initiate any enforcement proceedings, content instead to remind Moody's that "deceptive

ratings conduct [by NRSROs] is unlawful under the antifraud provisions of the federal securities laws." *Id.*[6]

**B. The SEC's Response to the Dodd-Frank Act Required Studies Provides Further Evidence of an Institutional Bias in Favor of the Large Issuer-Paid Firms and against Egan-Jones and The Independent Ratings Model.**

94.     There are additional extrinsic indicia of bias on the part of the SEC towards the large firms.  As detailed above, Section 968 of the Dodd-Frank Act mandated a "Study on SEC Revolving Door," based on concerns that the constant departure of SEC employees to work at the financial institutions they are charged with regulating created significant conflicts of interest.  That exact revolving door brought to the OCIE examination team just before the SEC filed the Administrative Proceeding a former employee of one of the issuer-paid NRSROs.

95.     In the Comptroller General's cover letter accompanying the Report on the "revolving door," it noted "concerns about the potential impact on SEC's ability to effectively carry out its mission when employees leave the agency to work for firms regulated by SEC[]."  *See* http://www.gao.gov/assets/330/320939.pdf.   The Report itself

---

[6]  Additionally, on September 22, 2011, McGraw Hill Cos., the parent company of S&P, disclosed in a regulatory filing that S&P received a Wells notice advising S&P that the SEC may institute an enforcement action, including disgorgement of fees, related to a $1.6 billion CDO known as Delphinus CDO 2007-1. Bloomberg reported on September 26, 2011 that this particular CDO "was highlighted in a U.S. Senate panel's report as a 'striking example' of how banks and ratings firms branded mortgage-linked products safe even as the housing market worsened in 2007. S&P rated six tranches of Delphinus AAA in August 2007 and began downgrading the securities by the end of the year, according to the Permanent Subcommittee on Investigations report released in April [2011]. By the end of 2008, they were rated as junk, according to the report." http://www.businessweek.com/news/2011-09-26/s-p-may-face-sec-sanctions-over-2007-rating-of-subprime-cdo.html.  The SEC has taken no action against S&P, and, if it does so, it stands to reason that it will not seek revocation of S&P's license to rate ABS. More likely, if the SEC does anything, the SEC merely will seek a disposition which S&P would be able to resolve and pay with ease and will have no effect on its business or its influence in the marketplace.

noted that "Academic researchers and citizen advocacy groups identified [as] challenges of employee movement between SEC and the private sector":

> *Competing interests for current SEC employees*: SEC Employees may be influenced by the prospect of future employment opportunities to be more lenient or favor prospective future employers while undertaking SEC actions.

*Id.* at 11-12.

96.     Because of its small size -- fewer than 20 employees -- there is very little to no possibility that an SEC employee involved in an investigation of Egan-Jones would consider the possibility of his or her future employment in deciding whether to take negative action against Egan-Jones.  The large firms, on the other hand, are indeed big, employing thousands of people, and both individually and as a group are powerful future employers of current SEC employees with NRSRO and CRA experience.

97.     Another notable study performed pursuant to the Dodd Frank Act, published in January 2012, is the "Alternative Compensation Models for Nationally Recognized Statistical Rating Organization."  *See* http://www.gao.gov/assets/590/587832.pdf.   In that study, in recognition of the deep-seated conflict of interest in the issuer-paid model, the GAO recommended seven alternatives to the issuer-paid monopoly.  In its conclusion, the GAO noted as significant that while the SEC was under statutory obligation to issue a rule which would set forth an alternative to the pure issuer-paid model by July 21, 2012 as per the Dodd Frank Act's mandated schedule, the SEC, as of the publication date, had not yet spoken with any of the architects of the seven proposed alternative models.

98.     The GAO cautioned that "[w]ithout consulting the authors to gain a comprehensive understanding of the proposed models, SEC may not have complete

38

information available to be able to fully determine the authorities it may need to implement a particular model" and similarly noted that the "SEC has not spoken to the authors of the proposed models to solicit additional details about their models -- information that could help inform SEC's analysis of the alternative compensation models and its report to Congress containing any recommendations for regulatory or statutory changes that it determines should be made to implement the findings of its study." *Id.* at 27-28.

99.    This documented failure on the SEC's part to adequately explore the alternatives to the large firm model is notable when viewed in the context of its continued willingness to turn a blind eye to those firms' inadequacies, failures and misdeeds, and yet seek to punish Egan-Jones for alleged conduct which harmed no one and did not affect a single rating.

**C. The SEC's Regulatory Inquiries and Enforcement Investigation of Egan-Jones have been Overwhelming to the Small Firm And Contrary to Congressional Directive.**

100.   Following passage of the Reform Act in 2006, in support of which Mr. Egan testified before both houses of Congress, Egan-Jones submitted an application on August 16, 2007 for registration as to three classes of securities credit ratings -- financial institutions, insurance companies and corporate issuers.  After additional correspondence with the SEC, and submission to the SEC of additional information, the SEC granted registration of Egan-Jones as an NRSRO as to those three classes of ratings on December 21, 2007.  Egan-Jones never before was a regulated entity.

101.   On July 14, 2008, Egan-Jones submitted its application for registration as an NRSRO to rate ABS and sovereign debt.  After correspondence with and comments from the

SEC, Egan-Jones submitted a supplement to the July 14, 2008 Form NRSRO application under cover letter dated September 2, 2008 addressing certain of the issues raised. Registration for the additional two classes of credit ratings requested was granted on December 4, 2008.

102.    Since then, Egan-Jones has been subject to an overwhelming regulatory burden of requests for documents, procedural demands and investigative testimony.  None of this extraordinarily expensive and time-consuming regulatory burden has to do with a claim that a single rating is inaccurate, unduly influenced or corrupted by conflict.  The regulatory burden has cost, at times, over 25% of revenue – an amount, upon information and belief, which far exceeds, proportionally, the regulatory burden on the large issuer-paid firms.

103.    In November 2008, Egan-Jones received notification from OCIE that it was commencing a regular examination of the firm and a related request for information.

104.    In May 2009, Egan-Jones received additional correspondence from OCIE about the upcoming examination scheduled for June 2009 and a request for additional information.

105.    OCIE was onsite at Egan-Jones for the examination in June 2009.  During the examination, OCIE questioned certain representations in Egan-Jones' NRSRO applications and subsequent updates filed by Egan-Jones regarding the past number of ratings issued regarding ABS and sovereign debt.

106.    On July 7, 2009, following the three-day onsite examination, OCIE sent to Egan-Jones a significant additional request for additional documents.  Egan-Jones responded with a 15,000 page document production.

107.    In August 2009, the Office of Inspector General issued a public report entitled "The SEC's Role Regarding and Oversight of Nationally Recognized Statistical Ratings Organizations" as Report No. 458, *available at http://www.sec-oig.gov/Reports/AuditsInspections/2009/Report458.pdf*.   The report discussed the fact that the SEC's Division of Trading and Markets identified issues with two NRSRO applications (seemingly referring to though not naming Egan-Jones) and criticized the Division of Trading and Markets for approving the applications anyway.

108.    In phone calls to Egan-Jones staff in August 2009, OCIE threatened enforcement action against Egan-Jones for alleged inadequacies in document and e-mail retention, audited financials, descriptions of ratings methodology in filings and similar matters unrelated to the accuracy and un-conflicted nature of Egan-Jones' ratings.

109.    In September 2009, counsel for Egan-Jones responded by detailing the significant changes that had been implemented in the firm to address the concerns of OCIE since becoming a regulated entity in December 2007.   The letter also explained, in detail, the methodology by which and regulatory landscape underlying the calculations of the number of past ratings.

110.    In February 2010, SEC Enforcement informed Egan-Jones that it had opened an informal inquiry.

111.    Pursuant to that inquiry, Egan-Jones received requests dated March 7, 2010, March 8, 2010, April 21, 2010, April 26, 2010, and provided additional information and books and records to Enforcement.   From February 2010 until June 2010, Egan-Jones retrieved, collated and provided to Enforcement tens of thousands of pages of documents.

112.    On July 30, 2010, Enforcement, pursuant to delegated authority under 17 C.F.R. § 200.30-4(a) (13), issued a formal order of investigation.

113.    In August 2010, Egan-Jones received its exam findings from OCIE's June 2009 exam.

114.    Days later on August 12, 2010, Egan-Jones received a letter notifying it of another 15E regulatory examination from OCIE and requested additional documents and information.  Egan-Jones' counsel also received a subpoena for investigative testimony from Enforcement for Egan-Jones' independent compliance professional who was not involved in the NRSRO application process.

115.    Starting on August 5, 2010, Enforcement issued additional subpoenas to Egan-Jones, including to Mr. Egan, the firm's in-house compliance officer, a former firm analyst, two of the firm's salespersons.  Upon information and belief, Enforcement also subpoenaed certain of the firm's customers.  Testimony pursuant to these subpoenas commenced in August 2010 and ended in early 2011.

116.    On approximately October 26, 2010, Trading and Markets staff notified Egan-Jones that the SEC was commencing its 15E regulatory examination for the review period December 1, 2009 through August 1, 2010 ("2010 Examination"). The 2010 Examination, which occurred on January 21, 2011 through February 4, 2011, included OCIE's onsite inspection at Egan-Jones, as well as interviews of Egan-Jones personnel.

117.    On July 16, 2011, Egan-Jones downgraded by one notch the credit rating of the sovereign debt of the United States.  On July 19 or 20, 2011, the SEC through OCIE violated the Reform Act by calling Egan-Jones and demanding support for the Egan-Jones

42

downgrade of United States sovereign debt. Some weeks later, on August 5, 2011, S&P matched Egan-Jones' downgrade.

118.    On September 15, 2011, the firm received OCIE's 2010 examination results letter.

119.    On October 12, 2011, Enforcement staff provided a telephone Wells notice to Egan-Jones and also sent a formal Wells notice in a letter of the same date, communicating its intent to recommend to the Commission that it authorize Enforcement to file an enforcement action against Egan-Jones.

120.    On November 2, 2011, Egan-Jones received notice of the 2011 section 15E regulatory examination.

121.    On November 4, 2011, OCIE Examination Staff requested an emergency call with Mr. Egan about the Jefferies downgrade, discussed *supra*. The SEC, again through its OCIE staff in contravention of the specific prohibition of such analysis as set forth in the Reform Act, questioned the downgrade of the Jefferies rating.   The questioning can be characterized as a cross-examination of Mr. Egan as to his reasons for the downgrade.[7]

---

[7] The one notch downgrade from BBB to BBB-, usually insignificant in the marketplace, sparked much activity.  During the interview, OCIE staff questioned Mr. Egan, asserting, among other things, that Jefferies European bank exposure was "fully hedged."  Mr. Egan responded that Jefferies' European bank exposure, in his judgment, was material and remarked that "the only perfect hedge is in a formal English garden."  As noted above, Jefferies thereafter liquidated its large position in European sovereign debt.  And, as to the SEC's assertion that sovereign exposure was "hedged," Mr. Egan's remark was, as is typical, prescient.  Just five months later, JP Morgan suffered over $2 billion in losses on trades that were supposedly "fully hedged."  *See, e.g.*, "'Whale' Fail: JP Morgan's $2 Billion Blunder Tied to London Trader," Time, Sam Gustin, *available at* http://business.time.com/2012/05/11/whale-fail-jp-morgans-2-billion-derivates-blunder-tied-to-mysterious london-trader/ ("JPMorgan's so-called chief investment office, which ostensibly manages risk for the bank, had engineered a 'synthetic credit portfolio' as a 'hedge' to balance out potential losses elsewhere on its books. Over the past two months, the positions started yielding huge trading losses. Finally, JPMorgan was forced to take a $2 billion trading loss[.]")  During the same period, and to this day, sovereign debt has continued to destabilize.  Mr. Egan's slight downgrade of Jefferies, while momentarily unpleasant, was a vital warning and may well have assisted that firm in avoiding losses.

122.   On November 11, 2011, Egan-Jones submitted its (39-page) Wells submission, a detailed response to the Wells notice, explaining why the proposed enforcement action was inappropriate.

123.   On December 9, 2011, Egan-Jones responded to the initial document requests stated in the November 2, 2011 section 15E regulatory examination notice.

124.   On December 30, 2011, Egan-Jones supplemented its December 9, 2011 responses with additional responsive documents.

125.   On February 3, 2012, OCIE sent an amended and updated document request which identified additional information required for the section 15E regulatory examination.

126.   On February 7, 2012, Egan-Jones provided an additional submission in response to the October 2011 Wells notice, specifically information about the two then recently released independent studies about Egan-Jones ratings performance.

127.   On February 10, 2012, Egan-Jones' long time designated compliance officer ("DCO") resigned from the firm for medical reasons.

128.   On February 23, 2012, Egan-Jones responded with additional information to OCIE's request for documents in advance of the section 15E regulatory examination.  Also, in that response, Egan-Jones timely notified OCIE of the DCO's departure and requested a short-term "small firm" exception to allow Mr. Egan to act as the firm's DCO while the firm undertook to find a qualified replacement.

129.   On a February 23, 2012 phone call, OCIE indicated its unwillingness to allow such an exemption and directed the firm immediately to devote resources to finding a qualified DCO.

44

130.   From March 18, 2012 through March 22, 2012, Egan-Jones prepared for and was subject to an onsite examination by OCIE which involved in-depth meetings, interviews and examinations of all of Egan-Jones' personnel and functions.

131.   On March 30, 2012, Egan-Jones filed its Form NRSRO annual certification which in many aspects reflected significant upgrades and changes to its internal policies and procedures, many of which were in response to the SEC's comments during the week-long onsite examination.

132.   By letter dated March 30, 2012, counsel to Egan-Jones and Mr. Egan requested, in response to information that Enforcement intended to recommend the filing of an administrative proceeding pursuant to sections 15E and 21C of the Exchange Act, that the SEC file any action in federal court.

133.   The SEC ignored this request.

**D.   The OCIE Staff's Unrestricted Movement from their Inspection and Examination Roles in and out of the Enforcement Investigation Violated the Rights of Egan-Jones and was an Abuse of Process.**

134.   During the OCIE examinations and Enforcement investigation, OCIE staff gravitated back and forth between divisions and duties. Such violates the separate functions of the two offices as contemplated by and enumerated in 17 C.F.R. §§ 200.19b (Director of the Division of Enforcement) and 200.19c (Director of the Office of Compliance Inspections and Examinations).

135.   The July 30, 2010 formal order of investigation did not designate members of the OCIE staff as officers thereon.

136.    On August 4, 2010, Enforcement acting for the SEC, pursuant to delegated authority under 17 C.F.R. §200.30-4(a)(1), amended the formal order of investigation to "designate as additional officers" staff from OCIE with intimate knowledge of Egan-Jones, based on the fact that they conducted the 15E examination for the review period December 21, 2007, the date on which Egan-Jones was granted NRSRO status, through April 10, 2009. The OCIE-sourced officers included the Assistant Director, the Branch Chief, and two Staff Attorneys.

137.    Section 21(b) of the Exchange Act provides expressly that "[f]or the purpose of any such investigation [as permitted under section 21(a) of the Exchange Act], or any other proceeding under this title, any member of the Commission or **any officer designated by it** is empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda or other records which the Commission deems relevant or material to the inquiry." (emphasis added)

138.    Congress, in and through section 21(b) of the Exchange Act, delegated expressly to the Commission the power to designate officers of its investigations.  Congress did not delegate to the Commission the ability to delegate to any of its staff, let alone any staff member of Enforcement, the ability to designate officers of the Commission for the purpose of an investigation.

139.    Effective August 11, 2009, the Commission amended its rules to delegate authority to the Director of Enforcement to issue formal orders of investigation.   The Commission, in amending its rule delegating this authority, reported that it found, "in

accordance with the Administrative Procedure Act (APA) (5 U.S.C. §553(b)(3)(A)), that this amendment relates solely to agency organization, procedure or practice."   In fact, the amendment of the rule to delegate authority to the Director of Enforcement violates the express language of section 21(b) of the Exchange Act and violates the APA.

140.    In a speech delivered on August 5, 2009, the Director of Enforcement stated that "I am announcing tonight that the Commission has approved, subject to certain exceptions, an order that delegates to the Division [of Enforcement] Director the authority to issue formal orders of investigation, with their accompanying subpoena power.   I in turn intend to delegate that authority to senior officers throughout the Division."   Remarks [of the Director of the Division of Enforcement] Before the New York City Bar: My First 100 Days as   Director   of   Enforcement,   New   York   (Aug.   5,   2009),   *available   at http://www.sec.gov/news/speech/2009/spch080509rk.htm*.   Congress did not authorize and the Commission did not have authority to authorize the Director of Enforcement to delegate authority to issue formal orders of investigation.

141.    Just as section 21(b) of the Exchange Act prohibits the Commission from delegating authority to any member of the Commission's staff the authority to issue a formal order of investigation, and given that there is no authority for the Director of Enforcement to in turn delegate such authority, Enforcement cannot designate a member of another Division of the Commission as an officer of an investigation on a formal order of investigation.   Thus, the designation and participation of members of OCIE staff as officers of the investigation violated section 21(b) of the Exchange Act and the express checks and balances imposed by Congress.

47

142.    Because the Commission violated express Congressional intent as set forth in section 21(b) of the Exchange Act and improperly delegated authority to the Director of Enforcement to issue formal orders of investigation, no authority exists pursuant to which the Director of Enforcement could in turn delegate "that authority to senior officers throughout the Division [of Enforcement]," and no authority exists pursuant to which the Director of Enforcement or any "senior officers" of Enforcement may designate officers of different Divisions of the Commission as officers on a formal order of investigation, the Commission violated the Administrative Procedure Act, 5 U.S.C. §302(b) and §§551 et seq., by the delegation and further sub-delegation of authority to issue formal orders of investigation. Moreover, the Commission's failure to provide notice of the proposed rulemaking and opportunities for public participation, which directly impacted all parties subject to an investigation under section 21(a) of the Exchange Act, also violated the APA.

143.    The next day, one of the OCIE staff attorneys attended investigative testimony, purportedly as an officer of the Commission, pursuant to the improperly delegated authority, and Egan-Jones objected on the record to her attendance and participation.

144.    On August 12, 2010, eight days after Enforcement amended the formal order and seven days after the OCIE staff attorney first participated in investigative testimony, three of the newly minted Enforcement staff, by virtue of their designation as officers of the investigation, participated in another regulatory examination telephone conference with staff of Egan-Jones.  On the conference call on behalf of OCIE were seven staff from OCIE and three from the Division of Trading and Markets.

48

145.   The officers of the investigation who participated in the August 12, 2010 conference call included the OCIE Branch Chief, and two OCIE staff attorneys. Notwithstanding that there were four other members of the OCIE staff on the call, it was the three officers of the Enforcement investigation who conducted the entire conference call, articulating and expressly alleging findings of possible violations of the federal securities laws and rules governing NRSROs.

146.   Egan-Jones, through counsel, responded that Egan-Jones disagreed with the findings and recommendations, but would not respond in writing directly to OCIE until the conclusion of Enforcement's investigation. Two OCIE staff attorneys continued to participate thereafter in additional investigative testimony, all subject to repeated objections by counsel to Egan-Jones and the witnesses.

147.   Enforcement claim and assert that their investigations on behalf of the Commission are objective fact-finding investigations.  That did not occur in the instant investigation because officers of the Commission, before even the second witness testified, had expressed officially on behalf of the Commission that violations of law had occurred, thereby tainting the investigation.

148.   While conducting the 2010 Examination, the OCIE Branch Chief, indifferent to his status as an officer of the investigation, led a conference call of OCIE and Division of Trading and Markets staff on November 23, 2010 inquiring into Egan-Jones' progress in complying with new provisions under the Dodd-Frank Act.

149.   Additionally, the OCIE Branch Chief participated actively in interviews and the onsite review for records.  Only when counsel objected to his participation in the

interview of Mr. Egan did the OCIE Branch Chief consider that his ever-present two-hat conflict could pose a challenge to the integrity of the OCIE examination. The OCIE Branch Chief chose not to participate only in that interview but did participate in and conduct other interviews.

150.    Undoubtedly in response to the recurring objection, on February 7, 2011, the Enforcement, pursuant to delegated authority under 17 C.F.R. §200.30-4(a)(4), amended the formal order of investigation "deleting [the Branch Chief] as an officer of the Commission."

151.    On July 16, 2011, Egan-Jones downgraded by one notch the credit rating of the sovereign debt of the United States.  As noted above, on July 19 or 20, 2011, OCIE, in a telephone call led by the OCIE Branch Chief and in violation of the Reform Act, called Egan-Jones and demanded support for the Egan-Jones downgrade of United States sovereign debt.

152.    On October 11, 2011, the OCIE Branch Chief and an OCIE Staff Attorney participated in the exit interview conference call for the 2010 Examination, through counsel. Egan-Jones objected to both of them participating on the call and in the issuance of findings and recommendations, because of their roles as officers of the SEC for purposes of the investigation.  The OCIE staff ignored the objection.

153.    On a conference call on November 4, 2011, the OCIE Branch Chief, who served for more than six months as an officer of the investigation, posed to Mr. Egan 19 of approximately 20 to 25 questions about the Jefferies downgrade.

154.    The February 23, 2012 phone call, on which OCIE indicated their unwillingness to allow the DCO exemption, was led by the OCIE Branch Chief.

50

155.    The March 18, 2012 through March 22, 2012 onsite examination was led by the OCIE Branch Chief.

**E.    The April 19, 2012 SEC Leak was Deliberate, came from within the SEC, and was Designed to Introduce an External Improper Influence to the SEC'S Deliberation on Whether to Authorize an Action Against Egan-Jones and Sean Egan. As such, it is Further Evidence of a Deep Institutional Bias, Despite Specific Congressional Direction to the Contrary, against Egan-Jones and The Independent Ratings Business Model.**

156.    On April 18, 2012, counsel spoke with the staff at Enforcement who indicated that the filing of an enforcement action was at least weeks, if not a few months, away.

157.    The next day, on Thursday April 19, 2012 at 12:30 p.m., counsel was contacted by a reporter to comment on and/or verify a leak the press had received that at 2:00 p.m., in a closed non-public Commission meeting, the SEC would deliberate and vote on whether to institute an enforcement action against Egan-Jones and Mr. Egan. *See "*SEC to vote on charges against Egan Jones-sources," April 19, 2012 1:08 p.m., Reuters, *available at* http://www.reuters.com/article/2012/04/19/eganjones-sec-idUSL2E8FJ9NG20120419  ("The U.S. Securities and Exchange Commission is planning to vote on Thursday on whether or not to charge credit-rating firm Egan-Jones with making intentional misstatements to regulators when applying to be a 'nationally recognized' rating agency, people familiar with the matter said.") (emphasis added); *see also*  "Ratings Firm Is in SEC Sights," The Wall Street Journal, Jean     Eaglesham     &     Jeannette     Neuman,     April     19,     2012,     *available     at* http://online.wsj.com/article/SB10001424052702303513404577354023825841812.html; "Egan-Jones Defends Credit Rating Business as SEC Weighs Charges," Bloomberg, Lisa Abramowicz,     April     19,     2012,     *available     at*     http://www.bloomberg.com/news/2012-04-

19/egan-jones-defends-credit-rating-business-as-sec-weighs-charges.html. The leak came internally from the SEC and, based on the request for comment to counsel and the detail provided to counsel about the proposed action, would have come from someone with knowledge of the Commission's meeting agenda and the specific content of Enforcement's recommendation.

158.    The status of such meetings under the Sunshine Act of 1976, 5 U.S.C. §552b, is "closed" pursuant to 17 C.F.R. §§ 200.402(a)(5), (7) and (10).

159.    Counsel for Egan-Jones immediately contacted the SEC to verify the information and, subsequently, its Office of Inspector General to lodge a formal complaint about the leak in the following e-mail:

> I am co-counsel to Egan-Jones and Sean Egan. [A reporter from] Reuters called Alan Futerfas, my co-counsel, in the 12:00 hour and told him that their (Reuters') SEC Reporter learned that the Commission today at 2:00 is voting on bringing charges against Egan-Jones and Sean Egan, and enumerated those charges with specificity. The information that the Reporter articulated to Alan was pretty detailed, suggesting that the reporter had intimate knowledge of the recommendation. The Reporter said that the charges being considered are willful misstatements on the NRSRO application, about ratings experience and violations of conflicts of interest policies.
>
> This level of detail, and Reuters' knowledge of exactly what the Commission is considering and when is deeply troubling. I wanted to bring it to your attention promptly. As I trust you understand, my co-counsel and/or I already have commented promptly (and sharply) about the leak of the Commission's deliberation.

160.    Counsel to Egan-Jones and Mr. Egan, who themselves were unaware of the non-public Commission meeting, requested that the SEC's Office of Inspector General ("OIG") conduct an investigation and spoke with representatives of OIG. Enforcement confirmed later that same day to Egan-Jones' and Mr. Egan's counsel that the SEC in fact

had voted during the non-public closed Commission meeting to authorize instituting an administrative proceeding against Egan-Jones and Mr. Egan.

161.    The leak could only have come from someone with knowledge of the agenda of the closed Commission meeting, and, more importantly, the content of the Enforcement Action Memorandum submitted to the SEC for its consideration.  The purpose of the leak only could have been to injure Egan-Jones and Mr. Egan by introducing an external, public and improper influence into the SEC's non-public deliberations on whether to authorize an administrative proceeding against Egan-Jones.

162.    This leak is powerful additional evidence of an institutional bias against Egan-Jones and the SEC's clear favoritism towards the conflicted issuer-paid firms.

**F.    The Institution of the Administrative Proceedings on April 24, 2012 and the Nature of the Allegations therein is Demonstrative of The SEC's Bias Against and its Favorable Coddling and Excusal of the Large Issuer-Paid Firms.**

163.    On April 24, 2012, the SEC brought the Administrative Proceeding against Egan-Jones and Mr. Egan.  By this filing, the SEC commenced an administrative proceeding against Egan-Jones and Mr. Egan before an Administrative Law Judge of the SEC seeking, among other relief, civil penalties.

164.    The specific relief of civil penalties that the SEC seeks in the Administrative Proceeding became available to the SEC as a result of passage of the Dodd-Frank Act, which became law on July 21, 2010. The principle conduct alleged as potentially violative of the Exchange Act and Rules promulgated thereunder, for example, the conduct relating to the 2008 NRSRO application, occurred years before that date.  The use or threat of such cited penalties is thus impermissibly retroactive.

165.    Moreover, the standards applicable to enforcement actions based on pre-Dodd Frank Act (July 21, 2010) conduct are contained in the Reform Act.  Under the Reform Act, Section D entitled "Censure, Denial, or Suspension of Registration; Notice and Hearing," enforcement action can only be taken if "on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension, bar or revocation is necessary for the protection of investors <u>and</u> in the public interest <u>and</u> that such [NRSRO]" has committed some violative act.  15 U.S.C.A. § 78o-7 (Emphasis added)

166.    Upon information and belief, the SEC did not utilize this analysis of these standards.

167.    The Administrative Proceeding alleges that Egan-Jones failed to "furnish the [SEC] with an application on Form NRSRO that follows the Form's instructions"; "submit[ed] false Q[ualified] I[nstitutional] B[uyer forms]"; did not have "employees sign the Code of Ethics on a timely basis and allow[ed] two employees to sign a version of the Code that omitted the provision governing ownership of securities"; failed to "make and retain records with respect to each current credit rating"; did not "include the identity of the analysts that participated in determining the credit rating, the identity of the person who approved the rating, and whether the rating was solicited or unsolicited";  did not have a "record documenting the established procedures and methodologies it uses to determine credit ratings" among other alleged deficiencies in Egan-Jones record-keeping; "issu[ed]or maintain[ed] a credit rating where an analyst involved in determining the credit rating, or a

person responsible for approving the credit rating, owns securities in the rated entity"; and "made ... material misstatements in its Form NRSRO[.]"[8]

168.     Nowhere in the 11-page, single-spaced Administrative Proceeding does the SEC question the quality, integrity and timeliness of a single rating issued by Egan-Jones, nor is there, nor can there be, any allegation that Egan-Jones' ratings have in any way harmed the market or even a single investor.[9]

169.     While Egan-Jones vigorously contests the validity of each of the allegations in the SEC's April 24, 2012 Order, they are recounted here to illustrate that: (a) the SEC chose to file such an Administrative Proceeding against EJR, the first so-targeted NRSRO under the new rules promulgated pursuant to the Reform Act and the Dodd-Frank Act, despite the SEC's paucity of guidance as to many of the paperwork requirements that the SEC now alleges Egan-Jones failed to meet; (b) none of the allegations concern in any way the accuracy of a single rating issued by Egan-Jones; (c) the SEC chose to target Egan-Jones, a small, independent, subscriber-funded NRSRO, where it has chosen not to bring administrative or civil injunctive enforcement proceedings against the issuer-paid firms for far more egregious and injurious conduct, the most recent in a line of actions which demonstrate arbitrary and irrational treatment of Egan-Jones; and (d) the SEC's overall

---

[8] As further example of the tenuous allegations in the Administrative Proceeding, the SEC alleges that two Egan-Jones analysts participated in determining credit ratings for issuers whose securities they owned in violation of the conflicts of interest rules.  What the SEC does not recite is that the securities holdings of the two analysts were nominal, the holdings were not traded and this occurred once for each analyst out of 5,000 to 6,000 ratings since 2007.  Moreover, the ratings actions were not affected in the slightest by the nominal holdings.  In addition, Egan-Jones took prompt remedial action and the offending analyst left the firm.

[9] The large issuer-paid firms have been the subject of at least 30 lawsuits predicated on allegations of inflated, corrupted ratings which misled and harmed pension funds, mutual funds and investors across the country.  *See* "Suddenly, the Rating Agencies Don't Look Untouchable," New York Times, May 22, 2010 *available at* http://www.nytimes.com/2010/05/23/business/23rating.html?pagewanted=all.

conduct with regard to Egan-Jones is directly contrary to the stated purposes of the Reform Act and the Dodd-Frank Act.

## VII.    THE NEED FOR REMOVAL TO THE DISTRICT COURT

170.    By its willful disregard of Congressional direction to encourage the independent firms, ameliorate the regulatory burden on independent NRSROs and otherwise encourage competition; its rank indifference to the separation of OCIE from Enforcement functions as to Egan-Jones and the tainting of the purportedly intended objectivity of the Enforcement investigation; its patently disparate treatment of Egan-Jones versus the large firms; and the effort by an SEC insider to compromise and influence the SEC's deliberative process with regard to Egan-Jones, it is abundantly clear that the SEC cannot impartially and properly utilize the administrative process in this case and that such would only further its unfair and biased effort to marginalize and diminish Egan-Jones to the benefit of the large, conflicted issuer-paid firms and the *status quo*.

171.    The SEC's inequitable treatment of Egan-Jones contributes to a competitive imbalance. All of the larger, long-established rating agencies have enormous revenues and comparable economies of scale deriving almost entirely from their issuer-paid business model. It is this very model which, as noted by Congress, Senate reports, SEC reports and other findings, created insurmountable financial conflicts of interest which led directly to the inflated ABS and CDO ratings which, in turn, collapsed the U.S. economy when the reality of that debt became apparent and the credit markets froze.

172.    Placing a disproportionately greater regulatory burden upon small, independent and subscriber-based firms, which, by their nature, have a far greater economic

incentive to issue ratings that are accurate and uncorrupted, encourages the conflict-ridden model and discourages the independent, uncorrupted business model. For example, since mid-2009, Egan-Jones has spent (at times) upwards of 25% of its revenue on legal and compliance-related expenses. Upon information and belief, this is an amount wholly disproportional to that spent on such matters by the larger agencies. This may be one of the reasons that Ratings and Investment Information, Inc., another small independent ratings firm, voluntarily withdrew from NRSRO registration in or about April 2010.

173.    The SEC's asymmetric and disparate treatment of Egan-Jones is thus precisely contrary to Congress' desire for additional competition in the ratings industry and for a reduction in the reliance on conflict-laden agencies, and is clearly contrary to the public interest.  The fact that the two CRAs most responsible for the collapse of the U.S. economy in 2007 and 2008 are still registered as NRSROs for ABS and sovereign debt, and that the SEC even would contemplate the license suspension of Egan-Jones, the firm which accurately predicted the hyper-inflation of ABS, and which has caused absolutely no harm to the market, reflects the SEC's disparate treatment of Egan-Jones and a direct attempt to frustrate and chill the Congressional mandate of public interest, the encouragement of competition and the issuance of ratings with independence, quality and integrity.

174.    The SEC operates through offices with distinct functions and responsibilities. In its interactions with Egan-Jones and bearing directly upon this investigation, OCIE staff has disregarded the separation of functions over Egan-Jones' objection, thereby irreparably tainting past and current examinations of Egan-Jones.

175.    Egan-Jones recognizes that federal agencies have the potential for providing adequate Due Process. However, Due Process at its core requires an orderly proceeding before an appropriate and impartial tribunal.  A statute delegating a quasi-judicial role to an agency cannot authorize the exemption of the agency from the requirement of Due Process. While there is no pre-ordained set of procedures which an agency must have in place to ensure Due Process is afforded, there is a baseline requirement that the rights of those hailed before the agency are protected by the rudimentary requirements of fair play.  Denial of Due Process undoubtedly occurs when the exercise of power by an agency is arbitrary and capricious.  The guarantee of Due Process is not adequately implemented by the conferring of adjudicative powers on an agency if the circumstances demonstrate a risk of actual bias or prejudgment.

176.    While administrative agencies have provided and do provide Due Process in vast situations, in this unique set of circumstances the SEC's own actions have made it so that Egan-Jones and Mr. Egan will not be afforded sufficient safeguards in the Administrative Proceeding, particularly given that oversight of the independent Administrative Law Judges and the appeal of any decisions by the Administrative Law Judges vests in the SEC that, through its staff and by its leak, compromised its dealings with Egan-Jones and Mr. Egan.

177.    The SEC has exhibited significant institutional bias against Egan-Jones in its disparate treatment of the firm, while subjecting Egan-Jones to a veritable onslaught of resource-draining investigations and improper second-guessing of its objectively sound and

prescient ratings, culminating in the SEC's filing of the Administrative Proceeding based only on alleged deficiencies and interpretive differences in application documents.

178.    The evidence of this bias includes the SEC's failure to adhere to the divisions of responsibility between its regulatory inspections and examinations arm and its investigative and enforcement arm.  It also includes the leak by the SEC just an hour and a half before the SEC would be considering in a non-public Commission meeting, one required to be non-public by the SEC's own regulations, whether to institute the Administrative Proceeding.  The bias is self-evident when Enforcement cannot and does not inform counsel to Egan-Jones and Mr. Egan about the meeting, but the SEC's staff tells the press, and the fact of the meeting is on the newswire services before the Commission even commences its consideration of the recommendation.  This leak guaranteed that what is intended to be a thoughtful and deliberative and confidential process essential to the SEC's ability to act impartially and without outside influence would be and was compromised.  The purpose of the leak only could have been to injure Egan-Jones.

179.    The SEC has acted arbitrarily and capriciously against Egan-Jones and Mr. Egan, effectively depriving them of fair consideration of the Wells submissions by leaking to Reuters in advance of its deliberations the exact time and nature of the enforcement action under consideration.

180.    The SEC's leak deprived Egan-Jones and Mr. Egan of the chance to have their Wells submissions considered in a deliberate fashion by its intended audience, the five SEC Commissioners.

181.    The Administrative Proceeding seeks to apply unconstitutionally and retroactively application of the Dodd-Frank Act.  Section 929P of the Dodd-Frank Act (1) amended section 21B(a) of the Exchange Act to permit the SEC to seek civil penalties prospectively in administrative cease-and-desist proceedings instituted under that statute and (2) amended section 15E of the Exchange Act to permit the SEC to seek civil penalties expressly (and prospectively) against NRSROs and their associated persons in administrative cease-and-desist proceedings instituted under that statute.  The Dodd-Frank Act contains no expression or implication of Congressional intent that these civil penalties provisions of the Dodd-Frank Act be applied retroactively.  Section 4 of the Dodd-Frank Act, instead, provides that "[e]xcept as otherwise specifically provided in this Act or the amendments made by this Act, this Act and such amendments shall take effect one day after the date of enactment of this Act."  The language of section 15E of the Exchange Act prior to the enactment of the Dodd-Frank Act, did not contemplate the imposition of civil penalties against NRSROs or persons associated with them.  Moreover, prior to enactment of the Dodd-Frank Act, section 15E of the Exchange Act did not permit the Commission to seek civil penalties against NRSROs or their associated persons in administrative cease-and-desist proceedings instituted under that statute.

182.    This Court should excuse the exhaustion of administrative remedies in this case because the government interests that might be served by exhaustion do not outweigh the interests to be served by immediate judicial review of the legal issues presented in this unique set of facts.  Egan-Jones and Mr. Egan have a compelling need for immediate judicial review as continued administrative proceedings will render this Complaint moot.

183.    In contrast to the efficiencies afforded by a judicial determination in this Court, SEC administrative review of the Administrative Proceeding would be futile.  The SEC's Administrative Proceeding has the indicia of a strategic filing decision, given its disregard for Egan-Jones and Mr. Egan's repeated expressed preference for any litigation with the SEC to be filed in a federal district court.  Thus, it is a foregone conclusion that the SEC will not change course and voluntarily move this action to federal court.

184.    The SEC administrative law judges have no greater expertise on these issues than a federal district court judge. This request for removal, however, is not at all a reflection on the assigned and learned Administrative Law Judge.  It is a reflection instead of the inadequate process of discovery and litigation of counterclaims and defenses available in the administrative forum, as well as the demonstrated bias against Egan-Jones of the SEC, which itself would consider any administrative appeal.

185.    There is no benign and non-discriminatory explanation for the SEC's decision to charge Egan-Jones and Mr. Egan altogether in light of its approach to the ratings firms Congress found responsible for the 2008 financial markets collapse, let alone to attempt to apply the Dodd-Frank Act retroactively through the SEC's own administrative forum.  The institution of the Administrative Proceeding against Egan-Jones, when none of the large firms have been so targeted, is the latest in the SEC's pattern of irrational unequal treatment of Egan-Jones.

186.    Given the express request of March 30, 2012 by Egan-Jones and Mr. Egan through counsel to bring proceedings, if any, in federal court, the SEC's choice of forum suggests a purpose of exercising near complete control over the proceeding and depriving

Egan-Jones and Mr. Egan of the opportunity to develop their defenses.  The SEC's decision to ignore this explicit preference was for the bad faith purpose of forcing Egan-Jones to defend itself in front of the very agency which has a demonstrated bias against it.

187.    The SEC's administrative machinery does not provide a reasonable mechanism for raising or pursuing the Due Process, Equal Protection and First Amendment claims. The SEC's Rules of Practice do not permit counterclaims against the SEC, nor do they allow the discovery, including depositions, of SEC personnel and documentation that would be necessary to elicit admissible evidence corroborative of such claims. The Due Process, selective prosecution, Equal Protection and First Amendment denial claims will turn entirely on extrinsic evidence of whether the SEC's decision to treat Egan-Jones and Mr. Egan differently from the other NRSROs was irrational, arbitrary, and discriminatory.  The SEC will oppose such claims and defenses in the Administrative Proceedings and it is unlikely that an administrative record bearing on this claim will be adequately developed for federal appellate court review.

188.    The SEC's pre-occupation with, selective prosecution of, and constant challenges to the ratings issued by Egan-Jones infringes significantly on the First Amendment rights of Egan-Jones and Mr. Egan  by attempting to diminish and marginalize Egan-Jones to the advantage of the large firms.

189.    The SEC's selective enforcement and use of the oversight powers delegated to it by Congress in the Reform Act have impermissibly targeted and infringed upon Egan-Jones' and Mr. Egan's affirmative rights to freedom of speech and expression as guaranteed by the First Amendment of the U.S. Constitution.

190.    Plaintiffs are outspoken critics of the SEC and the large firm model that it has perpetuated. The SEC has taken no appreciable steps to address, correct and punish the ratings-related errors and oversights of the large firms.

191.    The SEC's second-guessing of plaintiff's ratings, a protected form of speech, and its decision to file an administrative proceeding against plaintiffs, in which it seeks penalties which include a revocation the license to issue certain ratings, are an impermissible infringement on protected First Amendment activity and signal a content-based decision on the SEC's part favoring one group of speakers (the large firms) over the plaintiffs.

192.    That the SEC has only alleged application-related and other violations unrelated to the content of Egan-Jones' ratings is simply a pretext for punishment of Egan-Jones' outspoken and independent position when viewed in light of Egan-Jones' public criticism of the SEC, its challenge to the large firm model, the impermissible cross-pollination between OCIE and Enforcement in the course of the relentless and resource-draining several year investigation of Egan-Jones and Mr. Egan.

193.    The SEC has applied and is enforcing Exchange Act Rule 17(g), and the other rules pursuant to which the SEC brought the Administrative Proceeding against Egan-Jones and Mr. Egan, in a manner, while not on their face restrictive of speech, still infringes impermissibly on Egan-Jones' and Mr. Egan's protected First Amendment activity.

194.    The SEC's application and enforcement of Rule 17(g) and the other rules pursuant to which the Administrative Proceeding has been brought have a chilling effect on the constitutionally protected expression of Egan-Jones and Mr. Egan, which includes not

only their rating activity but their criticism of the SEC and the large firm model which its perpetuates, causing irreparable harm.

## VIII.   CLAIMS FOR RELIEF

195.   Egan-Jones and Mr. Egan repeat and re-allege the allegations of paragraphs 1-194, above.

196.   By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between the Plaintiffs, Egan-Jones and Mr. Egan, and the Defendant, the SEC, concerning whether, given the allegations of institutional bias alleged and supported herein, the SEC can be a proper litigant in and the tribunal for initial review in the administrative proceeding context, the retroactive effect of the civil penalty provisions of Dodd-Frank and whether Egan-Jones' and Mr. Egan's statutory Due Process, Equal Protection and First Amendment rights have been violated, including their rights to a jury trial, their rights to other procedural safeguards and access to federal court, the right to use the discovery procedures of the federal court to shape and prove their defenses, their ability to utilize the enumerated defenses, the applicability of the Federal Rules of Civil Procedure, the protections of the Federal Rules of Evidence crafted to bar unreliable evidence, as well as their rights to be free from content-motivated restrictions on their speech activity.

197.   Egan-Jones and Mr. Egan hereby demand a trial by jury on all issues so triable.

**WHEREFORE**, Egan-Jones and Mr. Egan pray for judgment and relief as follows:

      i.    A declaration that the SEC may not apply the civil penalty provisions of Dodd-Frank or other standards against Egan-Jones and Mr. Egan retroactively;

ii.   A declaration that the SEC's delegation of authority to issue a formal order of investigation and to designate officers of the SEC for the purpose of the investigation to the Division of Enforcement violates the Administrative Procedure Act;

iii.   A permanent injunction enjoining only those members of the staff of the SEC's Office of Compliance, Inspections and Examinations who served as officers of the investigation under the Division of Enforcement from conducting and participating in inspections and examinations only of Egan-Jones;

iv.   A permanent injunction enjoining the SEC from pursuing its Administrative Proceeding against Egan-Jones and Mr. Egan administratively and from otherwise violating their Due Process, Equal Protection and First Amendment rights;

v.   An Order removing the Administrative Proceeding and all further proceedings against Egan-Jones and Mr. Egan to the United States District Court for the District of Columbia; and

vi.   Such other and further relief as the Court may deem just and proper, including reasonable attorneys' fees and the costs of this action.

Dated:   June 6, 2012                              Respectfully submitted,


                                                   */s/David S. Wachen*
                                                   David S. Wachen (DC Bar No. 441836)
                                                   Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
                                                   12505 Park Potomac Avenue, 6th Floor,
                                                   Potomac, MD 20854
                                                   T: 301-231-0954
                                                   F: 301-230-2891
                                                   E: dwachen@shulmanrogers.com


Of Counsel:

           Jacob S. Frenkel, Esq.
           Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
           12505 Park Potomac Avenue, 6th Floor,
           Potomac, MD 20854
           T: 301-230-5214
           E: jfrenkel@shulmanrogers.com
           (Motion for Admission *Pro Hac Vice* Forthcoming)

           Alan S. Futerfas, Esq.
           Law Office of Alan S. Futerfas
           565 Fifth Avenue, 7th Floor
           New York, New York 10017
           T: 212-684-8400
           E: asfuterfas@futerfaslaw.com
           (Motion for Admission *Pro Hac Vice* Forthcoming)


              *Attorneys for Egan-Jones and Sean Egan*